Argued April 30, affirmed July 19, 1973

BAZAR, INC. ET AL, *Appellants, v.* DEPARTMENT
OF REVENUE, *Respondent.*

511 P2d 1226

*Maurice O. Georges,* Portland, argued the cause for

appellants. With him on the briefs were Miller, Anderson, Nash, Yerke & Wiener, Portland.

*Alfred B. Thomas,* Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief were Lee Johnson, Attorney General, and Theodore W. deLooze, Assistant Attorney General, Salem.

O'CONNELL, C. J.

This is an appeal by plaintiffs from a judgment of the Oregon Tax Court in favor of defendant Department of Revenue. In disposing of the case below the Tax Court wrote the following opinion which is unpublished:

"Plaintiffs appeal from the Department of Revenue's Opinion and Order No. VL 71-269 which sustained the valuation placed on the 1970-1971 Multnomah County assessment roll for certain real property located in the SE ¼ of Sec 5, T 1S, R 2E, WM, described as Tax Lots 74 and 248. Of this, $699,000 was attributed to the value of improvements as to which there is no dispute. Plaintiffs pray that this court set aside the department's order and determine that the true cash value of the land only be reduced from $1,297,000 to $668,600 for the 1970-1971 assessment year ($70,800 for Tax Lot 74 and $597,800 for Tax Lot 248).

"The plaintiff Oregon corporation is engaged in the discount department store and supermarket businesses. It operates 15 discount department stores and a substantially greater number of supermarkets. The subject property is land located at the northwest corner of Southeast 82nd Avenue and Division Street, in

Portland. Both 82nd Avenue and Division Street are attractive to retailers because heavily traveled. The two tax lots contain 10.95 acres or 476,982 square feet. The land is improved by the requisite buildings for operating a discount department store, with about two-thirds of the area blacktopped for parking. The property is operated as a unit but parcels are owned variously by the plaintiffs.

"An appraiser for Multnomah County had established the true cash value of the subject property as of January 1, 1970, as a part of his assignment to reappraise all commercial properties on Southeast 82nd Avenue from Southeast Stark Street on the north to the Multnomah County line on the south, except for the east side of 82nd from Stark to Holgate. The assignment was made as a part of the county's plan of continuing reappraisals to obtain uniformity required by ORS 308.234.

"The county's appraiser testified that the highest and best use of the property was 'as improved today or as of January 1, 1970,' without specifying supermarket or discount department store.

"The county's appraiser recognized that properties containing ten acres more or less are no longer available in the area (the exception being the Jacoby property of 9.36 acres). Basically, his determination of value rests upon relatively recent sales of smaller 82nd Avenue properties to purchasers seeking the same property attributes required by the plaintiffs; e.g., a level site with a location on a main thoroughfare with heavy traffic of the right quality, visibility, ease of access, adequate parking, and the like. His unit of valuation, typically used in this type of case, was the square foot. He found that sales data justified a

value range of $2.50 to $2.60 per square foot for property comparable to the 50,607 square feet found by him in Tax Lot 74, and concluded that no reduction was warranted in the assessed value of the land as of January 1, 1970, of the rounded figure $117,000 (or $2.31 per square foot).

"Turning to consideration of the larger Tax Lot 248, the witness stated in his appraisal report (on the fifth page of Defendant's Exhibit A):

" 'After the inspection of many urban sites, and comparing these to development of suburban locations, a difference within the market [for chain store sites] was observed. Surburban (sic) discount store sites were built on the fringe of the city's growth where large tracts of land were available at cheap prices with the anticipation that the urban sprawl would encompass them. Due to the lack of large tracts of land, very little activity was found in urban locations. The locations that did sell, sold for commercial rates due to the cost of assembling, smaller sites into a larger site.'

"Accordingly, he chose relatively recent, nearby sales of property to Dieringers, Fred Meyer and Safeway Stores as comparables, recognizing that such stores are not all discount department stores but that they compete for the same sites and sell to the same groups. He found current values of $3 per square foot. The witness made allowance for the fact that some of the comparables require less space than the discount store and allocated a $3 per square foot value only to 375,460 of the total 427,000 square feet (a rounded figure) in Tax Lot 248, for a value of $1,126,380. The remaining 51,540 square feet were valued at $1.10 per square foot, based on sales of like property in the area used for apartment house construction, or $56,694.

These two values total $1,183,074, supporting the assessed valuation of Tax Lot 248 of $1,180,000. This averages $2.76 per square foot. It appears to be in line with the assessed valuation of the allegedly only remaining large vacant site in the area, containing 9.36 acres (the Jacoby property).

"The plaintiffs had pleaded for a total land value of $668,600, a reduction of $628,400 from the assessed valuation entered on the roll as of January 1, 1970. The evidence is not clear as to the method followed by plaintiffs in establishing the pleaded value, which is a little over $1.40 per square foot. An intimation is gained from the testimony of the president of Bazar, Inc., a man with much experience in the acquisition of sites for establishment of discount department store outlets, who personally purchased the subject property for a discount store site in 1959-60. He distinguished between the typical supermarket (a separate food store, often located in a shopping center), requiring 20,000 square feet of building space plus parking, and a discount department store which requires 80,000 to 100,000 square feet of building space plus adequate parking. No site was deemed suitable by him for discount store purposes unless the land could be purchased or rented at a value range of fifty cents to $1.50 per square foot, although he would pay $2.50 per square foot for a supermarket site. His testimony set up guidelines for purchasers of discount department store sites but had no present relevance to the subject site, purchased a decade before in a rapidly developing district. There is no way to prevent formerly suburban land from increasing in value as urbanization takes over the area.

"The experienced and highly qualified appraiser presented by the plaintiffs as their chief witness did

not support the $668,600 land value pleaded. He agreed that property values are increasing generally on 82nd Avenue. If the subject property was unimproved and available on January 1, 1970, he would have given it a value of $1,073,210, or $2.25 per square foot ($223,790 less than the assessed value).

"Following instructions given him, the plaintiffs' appraiser found a valuation for both land and improvements (the latter of which was not before the court). His testimony as to highest and best use of the property was ambiguous. In his appraisal report (Pl Ex 2, pp 1-2) he states:

" 'Should the value of the land be considered on the basis of its being unimproved and available for its Highest and Best Use my estimate of the land value is $1,073,210 which is at an average rate of $2.25 per square foot.

" 'Should the land be valued by considering the Highest and Best Use to be as a site for a discount center, which is its present use, a value estimate of $477,000 is concluded with this being at the rate of $1.00 per square foot.'

"On page 7 of the report, he states categorically that: 'The Highest and Best Use of the property is considered to be its present use which is a discount center.' The defendant's appraiser testified that the highest and best use of the property is 'as improved,' but he did not restrict the highest and best use to a discount department store.

"Plaintiffs' appraiser gave five examples of discount department store site acquisitions, with land purchases at $1.77, $1.49, $1.60, $1.29 and $1.36 per square foot but these appear to relate to suburban sites which are not comparable to the subject property.

"Plaintiffs' appraiser made use of sales informa-

tion 'related to smaller commercial sites along South-east 82nd * * * sites which were acquired for discount centers and improved discount centers.' He found high land values proved by sales in the area of the subject property, noting sales of these smaller properties at $2.49, $2.51, $2.63, $3.00, $3.49 and $3.62 per square foot. In his opinion there was a lack of consistency in Southeast 82nd Street sales values and, since he was appraising both land and improvements, and because discount centers are often acquired as investment properties, he believed an income approach to be the most reliable method for determination of value of properties of this type. This would certainly be true if the problem presented was the value of land and improvements constituting investment property (which was the question presented to the appraiser) and there were no market data respecting unimproved land, but that is not the situation presented to the court.

"After evaluating the testimony, the court concludes that the subject property may have been 'properly' priced in 1959-60 as a site for a discount department store (although such a conclusion can only be inferred, no testimony having been adduced), but it appears that the price is too high for that purpose today, and the land is more suitable for a business seeking the same facilities and market but better able to survive on higher priced property (e.g., a super-market, according to the testimony). The principle observed by the plaintiffs' witness of holding purchase prices for land to $1.00 or $1.25 per square foot is not relevant, nor is the evidence of recent purchases in suburban areas made by successful discount department store chains.

"A market for the subject property was demon-

strated by the defendant and the assessed values used by the county on January 1, 1970, were well within the range of such values. The market data approach to value is to be preferred when it is available. *Portland Canning Co. v. Tax Com.*, 241 Or 109, 404 P2d 236 (1965). The preponderance of the testimony supports the defendant's Order No. VL 71-269, which is affirmed."

■ The question on appeal is whether the method used in arriving at the assessed value of plaintiffs' land is correct. As the opinion of the Tax Court points out, the county appraised the land on the basis of sales of comparable, although smaller, unimproved lots in the same area as plaintiffs' discount department store. Plaintiffs contend that their land should be valued on the basis of its existing use, as a discount department store, and that land suitable for such use sells for a lower price than land suitable for small-area commercial development. In support of this contention plaintiffs direct our attention to *Portland Golf Club v. State Tax Commission*, 255 Or 284, 465 P2d 883 (1970), and assert that the Tax Court erred by failing to follow that case.

In *Portland Golf Club* the Tax Commission and taxpayer agreed that the highest and best use of the land at issue was for golf club purposes. This permitted the Commission to tax the improvements at their full value. But as to the land itself, the Commission in effect took the inconsistent position that it could be valued as if its highest and best use was for residential purposes. We held that the Commission was not entitled to blow hot and cold and that if the Commission wanted to value the land for golf club purposes, it could add the value of the golf club improve-

ments but it could not then shift its ground and treat the land as residential property and thereby use a higher valuation for it. The corollary of this, of course, is that if the Commission proceeded on the theory that the highest and best use was for residential purposes, it could not then treat the land as golf club land in order to add the value of the golf club improvements.[①]

In *Portland Golf Club* we did not say that because land was improved in a certain way (as a golf club) that this would be regarded as establishing the highest and best use of the land for purposes of its valuation. Although we surmised that the highest and best use of the land was in fact for residential development, both the Tax Commission and the taxpayer were willing to proceed on the theory that the highest and best use was as a golf club. If either party had asserted and proved that the highest and best use of the land was for residential purposes, it would not have been open to anyone to argue that this was not the case. Since both parties conceded that the highest and best use of the land was for golf club purposes, it was proper for the court to so treat it.

In the more recent case of *Nepom v. Department of Revenue*, 264 Or 195, 504 P2d 1039 (1972), the land in question was located in an "M-2" zone, and consistent with that classification the parties agreed that its highest and best use was for light manufacturing and

---

[①] If the Commission had valued the golf club land as if its highest and best use was for residential purposes and if it could have been shown that a purchaser would pay something more than the value of the land for residential purposes because there was a golf club facility there, that added value could be recognized in assessing the property. But as we noted in Nepom v. Department of Revenue, 264 Or 195, 504 P2d 1039 (1972), in commenting upon that hypothetical case, it is not likely that a purchaser would pay any added value under such circumstances.

distribution. The land was valued upon that basis although the existing improvements, consisting of apartment units, were incompatible with the highest and best use of the land.[2]

■ Plaintiffs' position is that they are entitled to have their assessed land value reduced to make it compatible with its use as improved. This is untenable and would constitute a perversion of *Portland Golf Club* and *Nepom*. When land is purchased in an area which later becomes urbanized, causing the value of the land to rise to a point which makes its existing use less sound economically, an owner cannot claim that because the value of his use has not kept pace with the increase in land value, he should be treated differently than those who make full economic use of their property.

■ Plaintiffs further argue that if it is held that the land was correctly valued, the case should nevertheless be remanded to redetermine the value of the improvements. Although the argument is not specifically spelled out, we take it to mean that the valuation of the improvements would be less if the highest and best use is determined to be for small-area commercial purposes (as the Tax Court found) than it would be if the highest and best use is for discount store purposes (which plaintiffs deemed it to be). However, it appears that the issue of valuation of the improvements was

---

[2] In *Nepom* we held that, despite this incompatibility, some portion of the value of the improvements could be added to the value of the land because the apartments would be so attractive to a prospective purchaser that he would pay a premium for the land over and above its value solely in terms of its highest and best use. This was so because the land was in a transitional stage before its actual use for its highest and best purpose, and therefore a purchaser could be expected to utilize the income-producing apartments for a period of time.

not raised by plaintiffs until this appeal was taken. This court will not consider questions not previously addressed to the trial court.

The judgment of the Tax Court is affirmed.