Argued and submitted February 8, modified August 7,
petition for rehearing denied by opinion October 2, 1979
See 287 Or 499, 601 P2d 473

# OREGON BROADCASTING COMPANY,
## *Appellant,*
### *v.*
# DEPARTMENT OF REVENUE,
## *Respondent.*
### (TC 1155, SC 25739)
598 P2d 689

[268]

Douglass H. Schmor, Medford, argued the cause for appellant. With him on the briefs were Carl M. Brophy and Brophy, Wilson & Duhaime, Medford.

James D. Manary, Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief was James A. Redden, Attorney General, Salem.

Before Denecke, Chief Justice, and Holman, Howell and Lent, Justices.

LENT, J.

**LENT, J.**

Plaintiff appeals from a decree of the Oregon Tax Court establishing a value of $219,340 for its property as of January 1, 1976.

Plaintiff's property consists of approximately 7.95 acres together with improvements in the form of a broadcast television studio, the administrative offices of Oregon Broadcasting, Inc., formerly Southern Oregon Broadcasting Company, and facilities for the transmission and reception of microwave signals. The property has a northwesterly boundary consisting of 500 feet of frontage on Crater Lake Highway and is one-quarter of a mile to the southwest from the highway's intersection with I-5. Its southeasterly boundary is of similar length and is formed by Bear Creek. The north and south boundaries are parallel lines. Approximately 2.3 acres of the property consists of unimproved land with a depth from the street of 200 feet, fronting on Crater Lake Highway, zoned C-7 (freeway service commercial); approximately 4.9 acres contains all of plaintiff's improvements, zoned C-5 (thoroughfare commercial); and approximately .75 acre consists of a channel easement for Bear Creek.

The Jackson County assessor divided plaintiff's land into these three separate parcels to determine its highest and best use and true cash values.[1] Using the market approach and an analysis of comparable sales he valued the C-7 land at $.75 per square foot, or $75,000, the C-5 land at $.092 per square foot, or $19,600, and the channel easement at $500, giving a total land value of $95,100. A value of $111,820 was placed on the improvements, giving a total for the property of $206,920.

Plaintiff accepted the value of the improvements but appealed the land value to the Jackson County Board of Equalization which reduced the assessed value to $77,550. The county assessor appealed to the

---

[1] These terms are defined and discussed *infra* in the opinion.

defendant, pursuant to ORS 306.515, which restored the original assessed value in its Order No. VL 77-190. Plaintiff then appealed from defendant's order to the tax court, which in an unpublished opinion raised the assessed value of the land to $107,520 by assigning a value of $.15 per square foot for the C-5 land. Before the tax court the assessor's appraiser had raised her valuation of the C-5 land to that figure.

An initial question to be resolved in this case is whether the value of the improvements is properly at issue before this court. The department contends that only the value of the land is at issue and that the improvements are not properly under appeal in this case. The county assessor's appraiser testified that she valued the land at its highest and best use without taking into consideration any resulting effect on the improvements because "[t]he improvements aren't-weren't in issue."

■ Plaintiff admits that it only appealed the value of the land to the Jackson County Board of Equalization, but contends that ORS 305.425 requires only that an issue be "raised" before the department in order to be considered by the tax court, and then by this court. ORS 305.425(3) governs reviewable issues before the tax court and provides in pertinent part:

> "In the case of proceedings to set aside an order or determination of the department, except as provided in subsection (1) of ORS 305.560, the issues of fact and law shall be restricted to those *raised* by the parties in the appeal to the department. If the court finds that other issues are important to a full determination of the controversy, it shall remand the whole matter to the department for further determination and the issuance of a new order, unless the parties and the department stipulate to the determination of such other issues without remand to the department." (Emphasis added)

ORS 305.445 governs appeals to the Supreme Court and states that such appeals "shall be in accordance with the procedure in equity cases on appeal from a

circuit court." ORS 19.125(3) governs the scope of review by this court in equity cases and provides that "the cause shall be tried anew *upon the record.*" (emphasis added) Unless an issue is raised before the tax court, this court will not consider it. *Bazar, Inc. v. Dept. of Revenue,* 266 Or 177, 187, 511 P2d 1226 (1973).

■ Under ORS 305.425(3) it is apparently not necessary for an issue to be considered at the board of equalization hearing before it could be considered at the tax court. Defendant did not mention this statute in its brief to this court or in oral argument before this court, but in its brief to the tax court defendant cited the statute for the proposition that "[w]hen the issue of the assessed value of improvements was not before the Department of Revenue, the tax court is prohibited from reviewing that value unless essential for determination of the controversy." We find the value of the improvements was raised by plaintiff at the department hearing. It is apparent that plaintiff did argue that the value of the C-7 land could not be determined without considering the impact of C-7 development on the improvements existing on the C-5 land. The department referee referred to this argument in his opinion and order:

> "In his brief, Counsel for Intervenor attempts to distinguish *Sabin* because the parties there were in agreement that the highest and best use of the subject property was as land suitable for commercial development. Counsel suggests that if the *Sabin* rule were to be applied to the facts in the instant case the existing improvements on the subject property would have no taxable value. Though we do not agree with Counsel's conclusion, his argument warrants consideration."

It is not clear how defendant expected the issue to otherwise be raised at the department hearing since it was the county assessor who appealed the matter to the department and limited his appeal to the value of the land.

[271]

■ As for whether the improvement valuation issue was properly raised before the tax court, in paragraph IV of its complaint plaintiff stated:

"The assessor valued each parcel separately, based upon the assessor's determination of the highest and best use of each such parcel, without considering the highest and best use of the property as a whole or the manner in which the continued present use of plaintiff's broadcast facilities located on Parcel 2 precluded or restricted development of plaintiff's unimproved land (Parcel 1), and without considering the degree to which the assessed value of plaintiff's broadcast facilities and improvements (Parcel 2) would be reduced if development occurred on Parcel 1."

We find that the issue of the value of the improvements was adequately raised before the tax court and is properly considered on appeal by this court. The tax court also decided in favor of plaintiff on this issue in overruling a department motion to keep out evidence of the value of the improvements and in stating that the department would have a ground for appeal on that basis.

Defendant's citation of authority on this issue is unpersuasive. In its brief to this court defendant cites *Nepom v. Dept. of Revenue,* 272 Or 249, 536 P2d 496 (1975), for the proposition that "[w]hen a taxpayer separately appeals either the land or improvements of a property, the unappealed element is not at issue and cannot be modified." In *Nepom* the taxpayer appealed only the value of the improvements to the tax court. The record was not clear as to whether the appeal was so limited at the board of equalization and department hearings. The tax court judge in his decree modified the value of the land and this court held that the plaintiff was entitled to challenge only the value of the improvements and that the value of the land was not at issue in the case.

The facts in the case at hand are substantially different from those in *Nepom.* As discussed above, at

the department hearing it was the county assessor who appealed only the value of the land, and even then the taxpayer raised the issue of the value of the improvements in its argument. Since the issue of the improvements was raised at the department hearing, we need not decide whether plaintiff would be foreclosed from raising an issue before the tax court that was not raised at the department hearing at which it was the department or county assessor who brought the appeal. Also unlike *Nepom,* at the tax court proceeding in the case at hand plaintiff in its complaint addressed the values of both the land and improvements.

Defendant also cites the *Bazar* case as authority supporting its argument that plaintiff did not properly raise the issue of the value of the improvements. However, in that case the issue of valuation of improvements was not considered by this court because it was not raised by the plaintiffs before the tax court.

Having decided that the value of the improvements as well as of the land is properly at issue before us, the next issue to determine is the role of the concept of "highest and best use" in finding a value for the property. Both parties agree that the standard of "highest and best use" is to be applied in this case. However, the record is lacking in an adequate definition of the term and discussion of its application.

■ ■ The parties in their briefs and the tax court in its opinion cited and quoted from several authorities as to the meaning of and method for determining "highest and best use." Only a few quotes by these authorities were introduced as evidence in the tax court. As made clear in *Bend Millwork v. Dept. of Revenue,* 285 Or 577, 583-585, 592 P2d 986 (1979), which came down after this case was heard before the tax court, our role as fact finder is to try the case "anew upon the record" and we should not go outside the record for evidence on the definition of terminology or on methods of appraisal. The defendant at one point in its brief notes that one of its authorities was quoted by this court in

[273]

*Nepom,* 272 Or at 254-255, n 3. It is not clear from that opinion whether that source had been received in evidence, but it should have been in order to be used by the court. *See Bend Millwork,* 285 Or at 585, n 4.

■ Defendant's witness did include the following definition of "highest and best use" in her appraisal report which the parties agreed would be treated as testimony:

> " 'The use which, at the time of the appraisal, is most likely to produce the greatest net return to the land over a given period of time.' American Institute of Real Estate Appraisers — *'The Appraisal of Real Estate'* page 33."

There is no discussion of this definition and plaintiff did not present an alternative definition of the term. Actually, the above appears to be a misquote. The witness does not cite the edition of *The Appraisal of Real Estate* from which she quotes, but the fifth edition of 1967 states, at 29:

> "Fundamental to the concept of value is the theory of highest and best (or most profitable) use. Briefly it can be defined as that use which at the time of appraisal is most likely to produce the greatest net return to the land and/or building over a given period of time."

The sixth edition of 1973 states, at 43:

> "Fundamental to the concept of value is the theory of highest, best, and most profitable use. Highest and best use is that which, at the time of appraisal, is the most profitable likely use of a property. It may also be defined as that available use and program of future utilization which produces the highest present land value."

Since these definitions are not in the record we do not consider them as evidence in this case.

Though not clearly defined in the record, the parties apparently agree that by "highest and best use" they mean the use which would result in highest market value as of the assessment date. Used in the context of ad valorem taxation, this is consistent with ORS 308.232 which requires property to be assessed at

100 percent of its true cash value and ORS 308.205 which defines true cash value as market value as of the assessment date.

The point at which the parties disagree is with the application of "highest and best use." While plaintiff applies the standard in the context of the property as a whole, including land and improvements, defendant apparently believes the highest and best use of the land alone should be determined. The department asserts in its brief to this court that "land must be valued as unimproved and available as of the assessment date" and that "[i]f any loss occurs due to the use of the land for its highest and best use, that use is reflected in the value of the improvements." It is not entirely clear whether defendant is asserting that conceptually the highest and best use standard should be applied to land only rather than the property as a whole or is just asserting that here, where defendant claims plaintiff has only properly appealed the value of the land, highest and best use only applies to the land.

Plaintiff essentially argues that while the highest and best use of the land may be, as defendant contends, a division of the land into the C-7, C-5, and Bear Creek parcels, the highest and best use of the property as a whole is its current use because development of the C-7 land would reduce the value of the existing improvements on the C-5 land so that a division of the property into the various zones would result in a lower value than the current use.

A similar situation to the case at hand existed in *Portland Golf Club v. Tax Com.,* 255 Or 284, 465 P2d 883 (1970), where the value of the land at its highest and best use was for residential purposes at $451,000 and the value of its golf course improvements was $624,000. Such uses were incompatible and since the parties had stipulated that a golf course was the highest and best use of the property, this court agreed with the tax court that the land value should be

[275]

reduced $308,000.[2] As in the case at hand, in *Portland Golf* the orientation of the assessment was toward the highest and best use of the property as a whole, though there the parties had stipulated as to the highest and best use of the property.

In its discussion of highest and best use in its opinion in the case at hand, the tax court quoted from *Bazar,* 266 Or at 186: "[A]n owner cannot claim that because the value of his use has not kept pace with the increasing land value, he should be treated differently than those who make full economic use of their property." As pointed out above, however, in *Bazar* only the value of the land was at issue, while here the value of the whole property, including land and improvements is at issue.

■ ■ While land and improvements are to be valued separately, when both are at issue they should be valued so that together they constitute the highest and best use of the property as a whole. That is, if the highest and best use of the land as vacant and available reduces the value of existing improvements so that the total value of land and improvements is less than the value of the existing improvements and their corresponding current land use value, then the property should be valued at its existing use.[3]

■ In its brief to this court defendant cites *Nepom v. Dept. of Revenue,* 272 Or 249, 536 P2d 496 (1975), for the proposition that land and improvements should be valued separately, with land as vacant and available at its highest and best use and any resulting adverse

---

[2] In *Nepom v. Dept. of Revenue,* 264 Or 195, 198, 504 P2d 1039 (1972), *Portland Golf* was somewhat misinterpreted as involving a golf course assessed on the basis of its highest and best use for residential purposes and as holding that it was impermissible to add to the value of the land the value of the golf house and other improvements.

[3] Were the policy behind application of highest and best use in assessment cases solely to promote development of land to its highest and best use, then the highest and best use of the land would be the starting point or basic assumption of the appraisal. Here, though, highest and best use is to be applied in the context of market value of the property as of the assessment date.

effect on improvements deducted from the value of the improvements. That is not exactly what *Nepom* held. It simply states that land and improvements need not be considered together as a single entity on appeal, that a taxpayer may separately appeal either the land or the improvements of a property, and that the unappealed element is then not at issue and cannot be modified. In footnote 3, discussed above, 272 Or at 254-255, an authority is quoted for the proposition that there "are many valid reasons for separate values of the land and improvements." One reason given is to determine "the highest, best and most profitable use of the land—the key to economic obsolescence where land is under improved." That certainly is one use of separate valuations of land and improvements, but hardly constitutes a holding by this court that the highest and best use value of land should always be used or should be the focal point in valuing a property.

In *Portland Golf* there is a comment which might be read as stating that an assessment should always begin with a highest and best use valuation of the land. After discussing evidence of the value of golf course land the opinion states, 255 Or at 288, "However, in our opinion this is as close to reality as one can come in making an appraisal in the unreal world which is created by the assumption that the highest and best use of plaintiff's land is not for residential purposes." To the extent that dictum is inconsistent with this opinion, this opinion is controlling.

Accepting that the goal of the appraisal is the highest and best use of the property rather than the highest and best use of the land alone, the next step is to compare the values of alternative uses of the property under the facts of this case to determine the highest and best use of the property. In this case the parties agree that the value of the improvements is $111,820, as such, but disagree about the proper methods for valuing the land and adjusting the property value for any incompatibility between the improvements and the use of the land.

[277]

Based on a "comparable sale" near the subject property, plaintiff's appraiser valued the land at $9,000 to $11,000 per acre, or a value range of $64,800 to $79,200. Apparently the value range was used because the "comparable sale" was actually developed from separate sales of parcels of a property which as a whole made for a comparable site to the subject property. There was little if any criticism by defendant of the use of this "comparable sale" to set a value for the land's existing use, except that defendant just argued that the land should be valued at its highest and best use. However, unlike in *Portland Golf* where the price paid for golf course land by other golf clubs within 60 miles of the subject property was used at least in part to establish an existing use value of the land, plaintiff here did not review land with similar or identical uses. On the other hand, in some situations it might be quite difficult to find a comparable sale of land put to an identical or similar use. The approach taken by plaintiff's appraiser, which we find acceptable in this case, was to use a sale of land which was near the subject property and had similar though slightly less favorable visibility and access to the highway and I-5, and which had the same site potential in terms of broadcast and receiver capability for microwave transmission to and from facilities on mountains in the surrounding area. Because the comparable sale site is not quite as good as the subject property in terms of access and visibility, we will use the upper end of the value spectrum found by plaintiff's appraiser, $79,200. This value applies to 7.2 acres, with the remaining .75 acre along Bear Creek valued at $500. Added to the improvement value of $111,820 this results in a total value of $191,520.

As described above, the county assessor's appraiser in her highest and best use valuation of the land valued the C-7 land at $75,000, the C-5 land at $19,600, and Bear Creek at $500, for a total of $95,100. At the tax court she raised her appraisal of the C-5 land to $32,020, for a total land value of

$107,520. Plaintiff's appraiser stated that she did not disagree with the initial values placed on the land according to the zoning, except that the improvements would be affected by development according to the C-7 zoning. As for the assessor's appraiser's two valuations of the C-5 zoning, the initial appraisal and review of comparable sales to determine the highest and best use of the C-5 land appears more valid than her subsequent appraisal. For her first appraisal she took four comparables including three farther out from downtown Medford on Crater Lake Highway and one at the next interstate exchange. In her subsequent C-5 appraisal two of the six comparables were in downtown Medford and another at the next interstate exchange that consisted of only .31 of an acre and which she admitted on cross-examination was the least comparable. Because we find the initial appraisal to be preferable, we need not decide whether the second appraisal was properly considered by the tax court. The defendant had told the tax court that it was not contending any higher value than that found in the county assessor's initial appraisal, but ORS 305.435 may have been in effect at this time and allowed the court to make its own finding on the evidence. Added to the improvement value of $111,820, this land value of $95,100 results in a total of $206,920.

The next issue to determine is whether development of the C-7 land according to its zoning would affect the value of the improvements on the C-5 land and, if so, to what extent. Plaintiff's witnesses testified to a variety of relationships between the C-7 land and C-5 improvements which would affect the value of the improvements, including the land's use as an outdoor studio, as a buffer to electrical and noise interference, and as a clear space allowing visibility of the station to the highway. The only relationship, though, between the C-7 land and improvements to which plaintiff attributed a loss in value should the C-7 land be developed is the open space allowing the

receipt and transmission of microwave signals at the station. We find from the evidence that microwaves follow a direct line of sight and intervening natural or man-made objects between the transmitter and receiver create partial or complete losses of the wave. A C-7 development would allow structures up to 35 feet in height and a free-standing sign not to exceed 60 feet in height. The station currently has four microwave antennae located on top of the studio at heights of 35 feet and 38 feet above ground. Two are directed to the southeast and the microwaves would not be affected by a C-7 development. The other two are oriented most often to the northwest and pass over the northeastern corner of the C-7 land toward King Mountain. Other actual and potential microwave connections through the C-7 land include a backup microwave facility located on a hill 13 degrees farther to the west of the above antennae orientation, actual use of remote facilities on Central Point, a hill apparently a few degrees still farther to the west, possible future use approximately 42 degrees farther still to the west to another television station in Medford, and possible use of remote facilities elsewhere. There was also testimony that objects need not be in the direct line of sight to disrupt the waves and that the zone of protection for a wave transmitted from the station needed at plaintiff's property line on Crater Lake Highway is from 33.2 feet to 62.5 feet wide, depending on the frequency of the signal. Though some of the potential microwave use of the C-7 air space is speculative, the evidence is sufficient to establish that the value of the improvements would be affected by microwave interference.

Plaintiff's appraiser measured this effect by valuing the cost of an 85 foot antennae tower which would solve the microwave interference problem. Other witnesses for plaintiff predicted the need for a tower at a cost of $97,140, but we accept the appraiser's estimation of $50,000. The tax court objected to the validity of this cost as well as to the other ways the station would be affected and diminished in value, stating,

"All of the costs to which plaintiff adverts are based upon its ease in carrying on its business in the future and are of no interest to the 'market.'"

The cost of the antennae tower, though, is not related to the ease of carrying on business but rather to the ability to carry it on. Using the $111,820 reproduction cost new, less depreciation, of the improvements as their market value assumes their operation as a television station. These improvements are composed of not only buildings which would be viewed by the market as useful for a variety of purposes, but also specialized facilities which can be used solely as a television station particularly designed for the transmission and reception of microwave signals. To the extent these facilities could not operate without additional investment, presumably the market would not bring full value for them.

■ It is not clear, however, that the cost of an additional investment properly reflects the diminution of value of the existing facilities. Plaintiff essentially asserts that the facilities are reduced in value to the extent they are reduced in effectiveness as measured by the additional investment required to continue their current capabilities at the site. There is little, if any, discussion in the record as to the propriety of treating a capital expenditure as a reduction in value and deducting that cost from the reproduction cost new, less depreciation of the facilities. Though we have doubts as to the veracity of this measurement, we accept it here as a rough estimation of this alternative use of the property because 1) it is the only attempt by the parties to measure an impact on value caused by a C-7 development in the context of continued use of the property as a television facility, 2) it is difficult to imagine how else plaintiff could measure the effect of a C-7 development, and 3) defendant has not expressed any objection to this aspect of plaintiff's methodology. Plaintiff's appraiser argued that the cost should be deducted from the land value, but we find that it is

associated with the value of the improvements though caused by the land developed at its highest and best use. Actually, the department hearing officer in his opinion and order mentioned another approach to value in this case, taking the value of the improvements and valuing the highest and best use of the C-7 zoned land as diminished by restrictions on the C-7 land to allow continued use of the improvements. Neither party, though, developed that approach. Deducting $50,000 from the improvements leaves a value of $61,820, which added to the land's highest and best use value of $95,100 yields a total of $156,920.

The difficulty of measuring the effect of a C-7 development on these improvements points up the unique nature of this case. This case differs from other cases which have considered the effect of the highest and best use of the land on improvements. Here the property is considered divided into several parcels of land each valued at its highest and best use and the improvements are not on the parcel which has the inconsistent highest and best use. In cases where the improvements are on the land being valued at highest and best use, the improvements are often viewed as having no value. In *Sabin v. Dept. of Rev.,* 270 Or 422, 528 P2d 69 (1974), for example, where the parties agreed that the highest and best use of the property was as raw land, the court determined that the improvements had no value because they would have no effect on the amount a willing buyer would pay for the land at its highest and best use. The same result was found in *Portland Golf,* but in *Nepom,* 264 Or at 199, it was determined that a purchaser would pay a higher price for the land based upon value attributable to the improvements.

Another alternative use of the property is to view the improvements as no longer functional as a television facility but subject to other uses such as office space and a studio. In doing so, plaintiff's appraiser valued the improvements at $70,000, for a total of $165,100.

■ The values of the alternative uses of the property as developed in the record before us are $191,520 for its current use, $156,920 for the land at its highest and best use and improvements at their current use, and $165,100 for the land at its highest and best use and improvements at an alternative use such as a studio and office space.

On the basis of these alternative uses the highest and best use of the property as a whole is its current use at a value of $191,520.

Modified.