BERNARD SHEVACH, Judge pro tempore.
 

 Plaintiff appeals from defendant’s Order No. IH 77-8, dated April 13, 1978. In that order, defendant, on plaintiff’s appeal from the valuation of the subject property, issued by the Estate Audit Section of the Department of Revenue, determined that the property value was $970,000 and that plaintiff owed additional inheritance taxes based upon that assessment. In its complaint, plaintiff alleged that the fair market value of the property was not greater than $264,230. At the trial, the plaintiff’s appraisers testified that its true cash value was in the sum of $425,000 to $430,000 as of the appropriate valuation date; namely, the date of decedent’s death on December 4, 1973.
 

 The subject property has its situs approximately ten miles east of the City of Sandy, Oregon, to the north of State Highway 26, in an area known generally as the Mt. Hood Corridor. It is 34 miles east of Portland, Oregon, and lies two miles west of the community of Brightwood on the north side of the Sandy River. Marmot Road, traversing the property from east to west, essentially bisects it and is used for
 
 *[258]
 
 vehicular transportation purposes. There are approximately 1.8 miles of road frontage on each side of Marmot Road and approximately 1.28 miles of frontage on the Sandy River. The property totals approximately 820 acres, and, at the valuation date, contained some merchantable timber, two houses, six outbuildings, three ponds and two creeks.
 

 The acreage and outbuildings, mainly bams, were basically utilized for a cattle ranching operation and the land was leased for this purpose. The surrounding area consisted of a mix of large and small acreages devoted to agricultural uses, recreational and year-round residences, and forest land timber. Topographically, approximately 360 acres, located south of Marmot Road and along the river, were generally on a level plane while the remaining acreage north of the road sloped in a gradual manner.
 

 A salient fact, stressed by both plaintiff and defendant, was the encumbrance of approximately 100 acres of land near the northern boundary of the property by an easement consisting of Bonneville Power Administration and Portland General Electric power lines. The parties also emphasized soil erosion along the Sandy River as well as acreage subject to river flooding, with the defendant contending that approximately ten acres were so affected and the plaintiff alleging that 50 to 100 acres was the affected number.
 

 Zoning at the valuation date allowed, among other uses and purposes, one homesite per acre of land, although both plaintiff and defendant agreed that such a density would not be feasible, mainly because of sanitation needs.
 

 Regarding the use of the property, the parties in their appraisal reports (admitted into evidence as PI Ex 4 and Def Ex E) were in agreement that the highest and best use at the valuation date was for agricultural purposes, primarily a cattle ranch, with a future potential for rural homesites of approximately 20 to 40
 
 *[259]
 
 acres per dwelling, although at one point in their reports the parties inconsistently stated that the homesites should be 30 to 80 acres. The defendant’s appraiser testified at trial that the subject acreage, consisting of eight tax lots, might also be sold according to the acreage of each tax lot which would contain some parcels substantially exceeding 40 acres, and at one point in his testimony stated that 80 acres would probably be a typically marketable site for the subject property.
 

 At the trial, the testimony indicated a consensus between the parties as to the definition of highest and best use; namely, that reasonable and probable use that will support the highest present value as of the applicable date of appraisal.
 

 The value of property for inheritance tax purposes is its true cash value as of the date of the decedent’s death. ORS 118.150(1) (1973 Replacement Part); OAR 150-118.150(1). In an effort to substantiate the correctness of their respective valuations, plaintiff’s witnesses at the trial consisted of two appraisers, highly expert and qualified by reason of their long and diversified experience and training in property appraisals, sales, and land use analyses, and membership in prestigious appraisal societies and organizations. Defendant’s chief witness consisted of the appraiser hired by the Oregon Department of Revenue, qualified by reason of attendance at numerous appraisal courses and ten years of appraisal experience with various governmental agencies and bodies located within the State of Oregon, including the Oregon Inheritance Tax Division. However, unlike the plaintiff’s appraisers, the defendant’s appraiser had not engaged in buying, selling, or leasing properties for others, had not made feasibility studies relating to the subdivision or development of property, nor had he completed his qualifications for membership in appraisal societies and organizations.
 

 
 *[260]
 
 Each of the appraisers mainly utilized the market data approach in arriving at bare land value, relying on sales of what they deemed to be comparable properties. They arrived at such comparable bare land values by a residual approach. In this approach, the appraisers subtracted the value of timber and/or improvements, whenever either or both were present, from the value of comparable property to arrive at an indicated value for the bare land for each comparable property. The appraisers then adjusted the indicated residual land value amount for each comparable property to account for and reconcile differences to the subject property, using such adjustment factors as time of sale, location, and physical characteristics. Although the adjustments of plaintiff’s appraisers were made to account for the differences between each comparable property and the subject property, the defendant’s appraiser adjusted between each comparable property and a site of 80 acres in order to arrive at the value of the subject property. The defendant’s appraiser used such a size because in his words it was a "probably typical marketable size for the subject property * * Both plaintiff and defendant added to the land value of the subject, as so determined, the value of the timber and improvements in order to compute the property’s total valuation.
 

 The first of plaintiff’s appraisers selected five sales as comparable to the subject. All of the sales were located in the Mt. Hood Corridor within a few miles of the subject. Of course, the allegedly comparable properties could be comparable to the subject only if their highest and best use was the same as that of the subject, and the appraiser so testified. The sales occurred in December 1967, June 1968, July 1969, June 1973 and July 1974, and had size ranges of 110 acres, 120 acres, 155 acres, 352 acres and 550 acres. Four of the sales were made on contract and one sale was made for cash. Employing his adjustments, the appraiser concluded that, based on the comparable
 
 *[261]
 
 sales, the indicated value on a per acre basis for the subject property would be the following: Based on the appraiser’s sale number one, $434; based on sale number two, $461; based on sale number three, $473; based on sale number four, $342; and based on sale number five, $450. He then determined that the land value of the subject property, excluding the land encumbered by the power line easements and the land affected by the erosive and flooding action of the Sandy River, was $500 per acre.
 

 As a portion of his adjustment process, the appraiser decreased the dollar value of three of the comparable properties by 20 percent per acre in computing the per acre value for the subject, on the ground and for the reason that the properties were sold under contract and involved relatively small down payments. In his testimony, the appraiser gave the following rationale for the value decrease:
 

 "* * * I made an adjustment for terms. Here’s a sale that occurred with $10,000 down. About seven—little over seven percent or around seven percent down and, in order to equate it to cash, we know that basically there would had to have been a discount to convert it to cash or it wouldn’t have sold typically for that price for cash.
 

 On other sales the decrease was awarded for "favorable terms” or a "very small amount of money down.” In another portion of the record, the appraiser stated that "there is necessary to be a term adjustment to convert it (the contract) to a cash price.”
 

 The court does not agree, on the basis of the record in this case, that the value of the subject land should be reduced on a per acre basis because of the contract terms of comparable sales. The reasons are as follows:
 

 (a) Department of Revenue’s Administrative Rule OAR 150-118.150(1) states that true cash value (for inheritance tax valuation purposes) shall be taken to mean the amount in terms of money which a prop
 
 *[262]
 
 erty will bring if exposed for sale in the open market under the noncompulsive conditions stipulated in the regulation. Nothing in this definition forecloses a price in a contract of sale from being the equivalent of an "amount in terms of money” which the property may bring.
 

 (b) The assumption cannot be made, in the absence of sustaining evidence, that sellers prefer cash to contract terms and thus would discount contract terms if cash were available. The preference might be precisely the reverse. In International Association of Assessing Officers,
 
 Assessing and the Appraisal Process
 
 48 (2d ed 1968), the proposition is stated thusly:
 

 "It must also be remembered that noncash sales (such as contract sales) are the norm and often preferred in many situations—e.g., among people who have held property for a long time and are subject to large capital gains tax—and they are thus valid indications of the market. Discounts for contracts are indicators of market value for paper and not for real estate. * * *”
 

 (c) Even if the assumption were to be countenanced that discounts for contract purchases were indicators of market value for real estate sold on contract, the plaintiff has not submitted evidence of the terms involved in any of the contracts relating to the comparable sales sufficient to justify a market value reduction of the subject property of 20 percent. None of the relevant factors affecting the appropriate proportion of a contract discount, such as the interest rate, the maturity date, or the reliability of the debtor, is found in the recorded evidence. The State of Oregon deems these matters apposite as may be gleaned from a reading of the following excerpts from OAR 150-118.150(1):
 

 "* * * [T]he value of * * * contracts [for inheritance tax purposes] is the amount of unpaid principal plus accrued interest to the date of death, unless the personal representative can establish by satisfactory evidence that the item is worth less than said amounts because of low interest rate, of being uncollectible, or insufficient
 
 *[263]
 
 security, or of unreasonable maturity date, or of debtor being unreliable.”
 

 (d) In
 
 Thornton v. Dept. of Rev.,
 
 4 OTR 243, 246, 247 (1970), the plaintiff contended that contracts for the sale of land should be discounted by 20 to 25 percent when being used to fix the present true cash value of assessed land. In rejecting the argument, the court stated the following:
 

 "It is the opinion of the court that in the search for true cash value of land to be taxed it is improper to assign an arbitrary percentage factor to a sale because it is made on conditional sales contract or because the contract contains a release clause. In any given case such circumstances may or may not have materially affected the price. Each sale used in a market data appraisal must be subjectively and individually evaluated to determine the weight it merits in that particular valuation.
 

 An assertion that a contract for the sale of property typically results in the marketplace in a higher price than a cash sale cannot supplant evidence buttressing the assertion. Since such evidence is lacking, and since the plaintiff bears the burden of proof to establish its alleged value by a preponderance of the evidence, the court must disallow the 20 percent reduction as an adjustment. ORS 305.427. With this disallowance, the value per acre of the subject property made by plaintiff’s appraiser would be adjusted from the $500 determined by him to the amount of $600.
 

 Plaintiff’s second appraiser submitted in his appraisal report six sales allegedly comparable to the subject property and defendant’s appraiser submitted the same sales. All of the sales were in the Mt. Hood Corridor within a few miles of the subject. As to three of those sales, defendant’s appraiser placed very little weight on their validity since the purchase price was motivated by speculative factors relating to a future density of development which would not be comparable with the allowable density of the subject. Plaintiff essentially agreed with this analysis, and thus the court will disregard these three sales.
 

 
 *[264]
 
 The remaining sales occurred in May 1972, June 1973 and December 1974, and had size ranges of 34 acres, 81 acres and 154 acres. All of the sales were made on contract. Employing his adjustments from the comparable to the subject property, plantiff’s appraiser concluded that the indicated value on a per acre basis for the subject would be the following: Based on the appraiser’s sale number one, $533; based on sale number two, $417; and based on sale number three, $828. The defendant’s appraiser, for the same three sales, concluded that the valuations per acre for the subject, after adjustments, would be, respectively, $1,420, $1,075 and $1,730.
 

 As one of his adjustments, plaintiff’s appraiser made substantial reductions in the value of the subject property based on the difference in the size of the land tract of the comparable sale relative to the subject. The premise of the appraiser was that the cost of development into rural homesites of the subject would be substantially greater than that of the comparables because of the subject property’s larger size. This premise is illustrated by the following testimony of the appraiser in which the comparable sale involved an 81-acre tract of land:
 

 "The size. This is an area where I want to emphasize that when we’re comparing 80-acre sales to 800-acre sales, in this type of use, to me, they — they need a substantial adjustment factor. We’re talking about breaking a 800-acre piece of property into different — into a number of different sites at 80 acres each. This is — this is by comparison to this sale, and in order to do that, we have to take into consideration all the things that we have to go through in order to do that, which means a subdivision analysis, * * * engineering, * * * surveying, * * * development costs, roads, * * * domestic water supply, * * * interest costs. * * * sales expense. * * * profit. * * * management costs. So when we’re taking into consideration an adjustment from 820 acres back to — to 80 acres, in my opinion, it’s — it is worthy of a substantial adjustment factor. * * *”
 

 
 *[265]
 
 The plaintiff’s appraiser allowed a 40 percent size adjustment decrease in the valuation of the subject property in relation to the 81-acre sale, a 35 percent size adjustment decrease in relation to the 154-acre sale, and a 50 percent size adjustment decrease in relation to the 34-acre sale.
 

 The court agrees that a purchaser of land held for future sale in small parcels will consider development costs in fixing the purchase price he is willing to pay. However, this consideration in the case at bar must apply not only to an hypothesized buyer of the subject property but also to the buyers of the comparable properties. If comparable sales are to be regarded as legitimate indicators of market value for the subject property, the buyers of the comparable properties must, among other factors, be "* * * reasonably well-informed.” OAR 150-118.150(1). A reasonably well-informed buyer of the comparable property would deT termine and adjust the purchase price of it with a regard to future development costs even as would a purchaser of the subject property. Since the purchase price of the comparable property would reflect the buyer’s adjustment for contemplated development costs, an additional adjustment to that price would not indicate the value of the subject property but rather would distort it.
 

 If the highest and best use of the subject property is for potential rural homesites ranging from 20 to 40 acres, then, in order to be comparable, the sale property must also be susceptible to such division. For the 81- and 154-acre tracts, substantially the same expenses noted for the subject property’s development would equally apply to the comparable sales, and thus be accounted for in the prices of the comparable sales, since there is no evidence in the record that the development costs of these smaller tracts of land are proportionately different from the development costs of a larger tract of land. Therefore, the appraiser’s additional size adjustment decrease of the value of
 
 *[266]
 
 these comparable properties as an indicator of the value of the subject property cannot be allowed.
 

 However, the court does conclude that some size adjustment is in order. Both the plaintiff and defendant have testified that a larger tract of land sells for less per acre than a smaller tract because more buyers, and thus more demand, typically exist for a smaller tract. Plaintiff’s first appraiser allowed in his appraisal report a size adjustment decrease of 10 percent of the value of the subject property in relation to the sale of comparable tracts ranging from 110 to 352 acres. The court accepts this adjustment for the comparable sales of 81 and 154 acres. For the allegedly comparable sale of 34 acres, however, both because of the fact that its size falls within the size category of the highest and best use homesite, thus eliminating certain developmental costs, and because the tract accordingly would be placed in a different marketplace of buyers, the appraiser’s adjustment of a 50 percent decrease in the subject property in relation to the sale of the 34-acre tract is accepted. With these modifications, the price per acre of the subject property in relation to the three comparable sales would be increased from the base value determined by the appraiser to the amount of $687 per acre, $647 per acre, and $828 per acre.
 

 The analysis of the defendant’s appraiser results in a substantially different price per acre of the subject property. A portion of the difference is explicable in terms of variations in adjustments between the two appraisers concerning matters of timber and improvement valuations and location and size adjustments. Another point of difference which affected the defendant appraiser’s valuation of the subject property was his opinion, as expressed in his testimony, that adjustments should be made between the tracts involved in the comparable sales and an essentially fictive tract of 80 acres, rather than the subject tract. Presumably, the comparison base of the defendant’s appraiser emerged from his concept that the subject tract should
 
 *[267]
 
 be marketed in 80-acre parcels, a concept which contradicts a portion of his own appraisal report. Whatever validity this thesis might have under other circumstances, in the case at bar it is not tenable; for it is the view of the court that the highest and best use of the subject property, as this opinion will subsequently develop, would require a marketing of homesites of 20 to 40 acres.
 

 In making its valuation decision, the court is not confined to the values alleged by the parties. Rather, it is the court’s duty to determine value based upon the preponderance of the evidence presented. ORS 305.427; ORS 305.435;
 
 Tollefson v. Dept. of Rev.,
 
 8 OTR 1, 3 (1979). The court finds that the value set out in the appraisal report of plaintiff (PI Ex 3) of $500 per acre, increased by the disallowance of the 20 percent adjustment for contract terms, or $600 per acre, is the most accurate indicator of the value of the subject property. This report considers a larger number of valid comparable sales than do the other appraisal reports, and it considers sales as large as 550 acres and 352 acres in relation to the subject’s 820 acres, as contrasted with the largest sale of the other appraisers of 154 acres. Although all of the other three sales in the other appraisal reports required adjustments for the value of timber and/or improvements in order to arrive at residual land values, two of the sales set forth in PI Ex 3 consisted of land only and thus necessitated no such adjustments which, of course, may be inaccurate. Of particular merit was sale number three set forth on page 15 of PI Ex 3 which consisted of 352 acres of bare land sold at a price of $563 per acre when the adjustment for terms is eliminated. It is true that PI Ex 3 had some sales occurring several years before the valuation date, whereas the sales in the other appraisal reports were all close to that date; however, realistic time adjustments minimized this discrepancy. Regrettably, no other sale of a tract of land as large as that of the
 
 *[268]
 
 subject property appears to have occurred in a comparable sale in the Mt. Hood Corridor and, comparable sales without merchantable timber or improvements on the land were infrequent.
 

 It is the opinion of the court that the highest and best use is validly defined by the parties to be the reasonable and probable use that will support the highest present value as of the valuation date. To this effect,
 
 see Tollefson v. Dept. of Rev., supra,
 
 at 8, 9, and
 
 Oregon Broadcasting Co. v. Dept. of Revenue,
 
 287 Or 267, 274, 275, 598 P2d 689, 694 (1979). It is the further opinion of the court that such usage is for agriculture, mainly cattle ranching, with a future potential for rural homesites of 20 to 40 acres per dwelling, as both defendant’s appraiser and one of plaintiff’s appraisers in their respective appraisal reports agree (PI Ex 4, Def Ex E). The testimony is clear that a land tract of 20 to 40 acres per dwelling represented the maximum density allowable on the subject property from the standpoint of sanitation needs, and therefore the contemplated sale of tracts in that acreage category would maximize the highest present value as of the valuation date.
 

 Eelative to the value of land encumbered by the power transmission lines, one of plaintiff’s appraisers and defendant’s appraiser in their respective appraisal reports (PI Ex 4 and Def Ex E, at 46) stated that "[djiscussions with owners of property under power lines indicated very little, if any, inconvenience caused by the power lines,” and concurred that the acreage should be valued at 50 percent of the value of the unencumbered land. The other one of plaintiff’s appraisers accorded a value to this acreage equal to 25 percent of the value of the unencumbered land in his appraisal report. He sought to substantiate his value by reference to four sales in which a portion of the property was encumbered and in which the purchasers would pay nothing, or a small price, for the encumbered area (PI Ex 3, at 18 and Addenda). The four sales
 
 *[269]
 
 in PI Ex 3 appear to be in an area and for uses and purposes widely disparate from those of the subject property, and thus do not indicate a comparable value in the market for the subject encumbered property. Although the land underneath the power lines cannot be used for development, testimony at the trial indicates that it is usable for recreational purposes in a rural homesite ambience. Since recreational activity is a basic and important use of a rural homesite, the court concludes that approximately 100 acres of land affected by the power lines should be valued at one-half of the value of the unencumbered property, or $300 per acre, and that such value is supported by the preponderance of the evidence.
 

 The remaining land consists of land in the floodplain of the Sandy River and land subject to river erosion. The appraisers varied in their estimate of the quantum of affected land from 10 to 100 acres. At the trial the most convincing evidence of the involved area was offered by one of plaintiff’s appraisers who testified that his acreage computation entailed an investigation of the floodplain map for the area, as well as other maps, and a visual inspection. He noted that inquiries made of persons employed on the property elicited the response that erosion was continuing and photographic evidence was submitted as a substantiating exhibit (PI Ex 2). The court accepts his estimate that 50 acres were affected.
 

 The appraisers differed on the value of the affected property in a range from 25 percent to 50 percent of the value of the unencumbered land. Since the land in the floodplain is subject to flooding but not actually continually flooded, and since the land also is counted in arriving at the requisite zoning acreage for rural homesites, the court finds that a value of 50 percent of the unencumbered land, or $300 per acre, is supported by the preponderance of the evidence.
 

 In approaching the value of the timber, the parties all recognize that it had a commercial value to a buyer
 
 *[270]
 
 in excess of the bare land value and would be harvested prior to the development of rural homesites. The value of such a use in the transitional period, to the extent that it exceeds the bare land value, is properly includable in the total valuation. To this effect,
 
 see Nepom v. Dept. of Revenue,
 
 264 Or 195, 197, 198, 504 P2d 1039, 1040 (1972). The most accurate value attributable to the timber would result from a fair market value appraisal of the standing timber at the valuation date. Such an appraisal was made by timber appraisers employed by defendant and testified to by the defendant’s chief timber appraiser for the county concerned. The appraisal was the result of an actual cruise in which the various types of timber were differentiated, the volume of each type was ascertained, the value per 1,000 board feet of measurement of each type was stated, and the resulting value was totaled at $53,361 (Def Ex C). In contrast to this appraisal, the other appraisers made no cruise and made estimates based on their suppositions as to the quantity and type of timber present. The preponderance of the evidence sustains a timber valuation of $53,361 as the true cash value thereof.
 

 With respect to the value of the improvements, one of the plaintiff’s appraisers opined that the contribu-tive value of improvements is typically 15 percent of the land value and thus established the purported value; the other of plaintiff’s appraisers rendered an undocumented opinion that the improvements had a value of $25,000. The defendant’s appraiser in his appraisal report computed the value of the two residences using the cost approach of multiplying square footages by a per square foot construction cost, and deducting from this total value a depreciation factor. This depreciated replacement cost together with home-site development items, such as landscaping, constituted the sum of $38,600. The outbuildings were valued on a square footage basis at a low value, in recognition of their limited transitional use, in the
 
 *[271]
 
 amount of $38,600, for a total value of $77,200 for all improvements.
 

 The court is aware that a market data approach is preferable to a depreciated cost approach in property appraisal.
 
 Swenson v. Dept. of Revenue,
 
 276 Or 1, 4, 553 P2d 351, 353 (1976). However, since neither of the parties offered market data in support of their values, and since the depreciated cost approach was the only evidence tendered at the trial in support of an opinion of value, the court finds that the preponderance of the evidence sustains improvement valuation in the amount of $77,200.
 

 One of plaintiff’s appraisers offered an income approach which would sustain a value for the subject property of approximately $430,000. However, the court attaches little weight to this approach since the market data approach is a more accurate and preferred indicator of value and since the income approach related basically to a grazing lease which did not adequately reflect the transitional land value.
 
 Swenson v. Dept. of Revenue, supra,
 
 at 4. Evidence of this inadequacy is found in the fact that the annual lease rental amount, together with an assumed rental of one residence, was capitalized at the low rate of 5 percent per annum as of December 4, 1973, in order to reach a valuation of $430,000 (PI Ex 3, at 19). The other appraiser of plaintiff testified that he accorded very little weight to the lease rental amount in his value consideration.
 

 The court’s conclusion of the true cash value of the subject property as of the valuation date of December 4, 1973, is the following:
 

 (a) 670 acres of unencumbered, uneroded land at $600 per acre, for a total of $402,000;
 

 (b) 100 acres of encumbered land at $300 per acre, for a total of $30,000;
 

 (c) 50 acres of land subject to erosion and flooding at $300 per acre, for a total of $15,000;
 

 
 *[272]
 
 (d) Merchantable timber in the amount of $53,361;
 

 (e) Improvements in the amount of $77,200.
 

 The total true cash value of the subject property for inheritance tax valuation purposes is in the amount of $577,561.
 

 Defendant’s Order No. IH 77-8 is modified in accordance with this decision and its Estate Audit Section assessment shall be modified and reissued. If any tax in excess of the amount found necessary by this decision has been paid, it shall be refunded pursuant to ORS 118.171 (1977 Replacement Part).
 

 Plaintiff is entitled to its statutory costs and disbursements.