# IN THE OREGON TAX COURT

## GENERAL SERVICES ADMINISTRATION
*v.*
## DEPARTMENT OF REVENUE
### (TC 1830)

James L. Sutherland, Assistant United States Attorney, District of Oregon, Eugene, represented plaintiff.

G. F. Bartz, Assistant Attorney General, Department of Justice, Salem, represented defendant.

Decision for defendant rendered June 23, 1983.

**SAMUEL B. STEWART, Judge.**

The plaintiff appealed the January 1, 1980, assessment of certain real property improvements identified as Account No. 1088713 in the Lane County assessment records. The subject property, occupying a full city block on East Seventh Avenue, Eugene, Oregon, consists of a two-story federal courthouse and a four-story federal office building, currently occupied by federal agencies. Only the buildings are assessed.[1] The land is owned by the federal government and, therefore, is not subject to local taxation.

The plaintiff alleged that the true cash value of the subject property was $4,056,500 on January 1, 1980, while the defendant contended that the true cash value was $7,961,040. This great discrepancy results from differing opinions of the highest and best use of the property which determines the proper valuation method to be employed.

Thus the plaintiff asserts that the highest and best use of the subject property is that of a commercial or professional office building complex and therefore relied upon an income approach to valuation. The defendant contends that the subject property is a "special purpose" property with its highest and best use as that of a "governmental center." This determination resulted in defendant using a cost approach to value.[2] Therefore, the initial issue to be determined is the highest and best use of the subject property.

Both plaintiff and defendant rely on definitions of highest and best use derived from The American Institute of Real Estate Appraisers, plaintiff on *Real Estate Appraisal*

---

[1] The buildings were constructed under an agreement authorized by 40 USC § 602(a) (Public Law 92-313, § 5, June 16, 1972, 86 Stat 219) wherein plaintiff agreed to purchase the buildings over time. Subparagraph (d) of § 602(a) provides:

"With respect to any interest in real property acquired under the provisions of this section, the same shall be subject to State and local taxes until title to the same shall pass to the Government of the United States."

[2]

"In appraising a large existing multi-tenancy office building, the chief method is the *Income Approach.* In appraisal of a 'special purpose' building such as medical office centers, some types of government buildings, and school offices, reliance is generally placed on the *Cost Approach.* * * *" *See Encyclopedia of Real Estate Appraising* 371, Appraisal of Office Buildings (Friedman ed, 3rd ed 1978).

*Terminology* 107 (Boyce ed 1975); defendant on *The Appraisal of Real Estate* 43 (7th ed 1978). The Oregon Supreme Court has held that these definitions "mean the use which would result in highest market value as of the assessment date. And that, as so construed, "is consistent with ORS 308.232 which requires property to be assessed at 100 percent of its true cash value and ORS 308.205 which defines true cash value as market value as of the assessment date." *Oregon Broadcasting Co. v. Dept. of Revenue,* 287 Or 267, 274-275, 598 P2d 689 (1979).

In defendant's "Memorandum Regarding Valuation of Special Purpose Property," it maintains that the subject property is a special purpose property built with lavish use of space for aesthetic reasons, including a sculpture court, large entryways and lobbies in accordance with the needs of a federal courthouse, and that the likelihood of an alternative use is remote. (In this memorandum the defendant addresses the federal courthouse primarily, although the subject property consists of two buildings and the larger of the two is and has been used as an office building, housing numerous federal agencies.)

■ *Encyclopedia of Real Estate Appraising* 765 (Friedman ed, 3rd ed 1978) states that:

"A special-use property is one that is designed, equipped, and used for a particular type of business or operation, and is not easily adaptable to some other use because of the peculiar nature of the improvements. * * * Conversion of such properties to some other use is costly, and the market for them is generally limited. * * *"

The plaintiff alleges that the subject property does not meet the criteria set forth for special purpose building because the physical design features are not for specific use. The plaintiff contends that the office building is already a general use and the courtroom could be easily modified to house real estate, investment or banking offices; therefore, the subject property has a feasible alternate economic use as an office building. (Plaintiff's Post-Trial Memorandum, at 6.)

With reference to an alternate use, the defendant maintains that the plaintiff failed to request and obtain a building permit in accordance with the City of Eugene Code (hereafter Code) and failed to comply with the parking

requirements of that Code. With reference to the failure to obtain a building permit, the defendant contends that the improvement is "allowed to exist in its present form because the city is unable to enforce its code on the federal government. That same lack of conformity would estop the conversion to a different use than its current use as a federal courthouse." (Answer to Post Trial Memorandum, at 2.) (Defendant directs this charge of noncompliance against the federal courthouse only but, presumably, the charge would encompass the federal office building as well.)

■ Article IV, section 3, clause 2, of the United States Constitution expressly grants Congress the power to make rules and regulations respecting the properties of the federal government. However, the United States Supreme Court has ruled that a state's exercise of its police power is not superseded by a federal act "unless that was the clear and manifest purpose of Congress." *Ray v. Atlántic Richfield Co.*, 435 US 151, 198 S Ct 988, 55 L Ed2d 179 (1978).

41 CFR 101-19.002(k) (1980), a federal regulation concerning certain basic policies applicable to the construction of many federal "public buildings," states:

> "[S]pecial features of local codes directly related to local circumstances or practices will be, to the maximum extent practical, incorporated into the design."

41 CFR 101-19.003-6(a) defines the term "public building" as those including "Federal office buildings, post offices, * * * courthouses." Obviously the foregoing regulations do not indicate a "clear and manifest purpose of Congress" that federal office buildings and courthouses are exempt from local zoning and building codes.

Unrebutted testimony revealed that no application for a building permit was made for the subject property. It does not necessarily follow, however, that the buildings are, as a result, in noncompliance with the City of Eugene's building code, since no evidence was presented regarding any action by the City during or since construction of the buildings which were completed in 1975 alleging noncompliance.

With reference to the alleged failure to comply with the Code's parking requirements, defendant likewise contends that this failure precludes an alternate use.

The subject property is in a C-2 zone (Community Commercial District). Commercial offices and public buildings are specifically permitted in Section 9.422(k) 2. and (v) 2. of the Code, respectively. Section 9.582 of the Code states that:

"Off-street parking shall be provided on the development site for all AG, RA, R-1, C-1, M-1, M-2 and M-3 zones. In all other zones, the required parking shall be on the development site or within 400 feet of the development site * * *."

Therefore, C-2 zoning permits required parking to be within 400 feet of the site.

Section 9.586(c) 6. of the Code requires one parking space for every 400 square feet of gross floor area for office buildings. Public buildings are not specified in this section. Therefore, they are governed by Section 9.588, which states:

"The parking space requirements for buildings and uses not set forth herein shall be determined by the designated city official, and such determination shall be based upon the requirements for the most comparable building or use specified herein. The decision of the designated city official may be appealed to the board of appeals in the manner allowed for appeals as indicated in sections 9.732 to 9.758."

Testimony was received that there are 10 parking spaces on the site of the subject property and 144 spaces off the premises. No evidence was presented as to whether "the designated city official" would determine that 154 spaces is adequate for the use of the subject property; therefore, conversely, no evidence was presented that the subject property is in violation of the Code regarding parking requirements.

In order to convert the use of the property to commercial office buildings as urged by the plaintiff, the above-quoted Code sections indicate that approximately 87 additional parking spaces would be required "within 400 feet of the development site." Plaintiff's unrefuted testimony that there are properties for sale within a block of the subject property results in additional parking requirements not being an absolute barrier to conformance with regulations if the highest and best use were to be as commercial office buildings.

Information of public record regarding the ownership of the subject property reveals that, in order to finance the

construction of the subject property, a Public Buildings Purchase Contract and Trust Indenture was signed on August 1, 1973, between the United States of America, acting by and through the Administrator of General Services and First National City Bank, as trustee. A form of "Participation Certificates, Series H" was authorized to be issued in multiples of $5,000, due July 31, 2003. (Public Buildings Purchase Contract, at 3, 8.)

In other words, a creative type of financing was instituted whereby the General Services Administration designed the subject property, constructed it with funds from private investors and in effect leased it back with a pay-off (redemption of Participation Certificates) scheduled in 30 years at which time legal title would revert to the General Services Administration.

The subject property was completed in 1975, two years after the trust indenture was executed which contemplated a 30-year redemption period. It seems quite evident that the plaintiff intended the buildings constructed under the trust indenture plan to be used as federal buildings for a considerable period of time.

As stated in *Tollefson v. Dept. of Rev.*, 8 OTR 1, 8 (1979), quoting from *The Appraisal of Real Estate* 43 (7th ed 1978):

> "[T]he highest and best use for land is *'the use that, at the time of the appraisal, is the most profitable likely use. * * *'* "

*Tollefson, supra,* involved the question of whether land currently used for timber production was its highest and best use or whether, because of favorable zoning and rapid population growth, the highest and best use was subdivision of the land into rural homesites. The court, in *Tollfeson, supra,* at 8-9, pointed out that:

> "[T]he mere *possibility* of subdividing the property into rural homesites is not enough to support a finding that this constitutes the property's highest and best use. The requirement of valuation of property at its highest and best use does not sanction the adoption of merely speculative uses. * * * appraisers should limit themselves to highest and best use considerations that have a strong, present probability of achievement; i.e., the most *likely* use at the time. * * *"

Under the circumstances obtaining in the present case, the use of the buildings as a commercial or professional office building constitutes a "mere possibility" and, accordingly, does not have "a strong, present probability of achievement." Therefore, at the time of appraisal, i.e., January 1, 1980, the most likely use of the subject property is deemed to have been that of its present use as a federal courthouse and federal office building.

Having determined highest and best use of the subject property, the next step in the appraisal process is to value the same. As pointed out in n 2, the appraisal profession has, in appraising office buildings, primarily utilized the income approach and, in appraising "special purpose" buildings, has primarily used the cost approach. These were the procedures utilized by Messrs. John E. Day, an independent fee appraiser, who testified for plaintiff, and Joe D. Rose, Appraiser, Commercial-Industrial Section, Lane County Department of Assessment and Taxation, who testified for defendant. The Oregon Supreme Court has, however, stipulated a different hierarchy of valuation methods; namely:

> "If there is adequate data of comparable sales, that method is used because it more directly and accurately reflects what a willing buyer would pay a willing seller for the property subject to tax, thus reflecting the market value. If the data on comparable sales is inadequate, the capitalization method must be used unless the property is not income producing, in which case the cost approach is employed." *Swenson v. Dept. of Rev.*, 276 Or 1, 4, 553 P2d 351 (1976).

That hierarchy of valuation methods was subsequently, however, rejected in *Brooks Resources Corp. v. Dept. of Revenue,* 286 Or 499, 503, 595 P2d 1358 (1979), wherein the court observed that "the appropriateness of a particular valuation method or combination of methods is not determined by fixed principles of law, but is a factual determination that depends on the record developed in each case." And, in *Chapin v. Dept. of Rev.,* 290 Or 931, 936, 627 P2d 480 (1981), the court added that which method of the three methods of valuation used "depends upon the character of the property and the availability of data necessary to apply the various method."

Mr. Day, plaintiff's appraisal witness, indicated that:

(1)   The market data approach had been used in arriving at the value of the land (which had not been assessed by the county assessor) but that approach had not been used in valuing the improvements because there were no recent sales the size of the subject property in the City of Eugene.

(2)   The cost approach had only been used as a check on the value indicated by the income approach because the subject property was overbuilt and comprised an expensive improvement which would not be recognized to its full extent by a knowledgeable purchaser in the marketplace. A substitute and more functional facility could be designed to accomplish the existing use at a much lower cost.

(3)   The income approach was the most applicable to the valuation of income-producing properties and, since the subject property fell in this category, the income approach had to be used. (Plaintiff's Exhibit 1, at 27.)

Mr. Rose, defendant's appraisal witness, testified that:

(1)   The market data approach had been utilized by analyzing three sales but that he had concluded that the data obtained was unsatisfactory compared with other methods because indirect and unstable. (Defendant's Exhibit A, at 16.)

(2)   The income approach had not been used because to obtain rents from privately owned buildings that were designed and constructed to generate income to the owner and use those rents as a basis for estimating a market rent for a public service type building would require adjustments without data to support those estimated adjustments. (Defendant's Exhibit A, at 10.)

(3)   The cost approach was utilized by using actual cost data furnished by plaintiff with adjustments for time and physical depreciation. No adjustments were made for functional and economic obsolescence.

Both appraisers considered but rejected the use of the market data approach. Predicated upon absence in the record of sales having probative value, the court must, of necessity, likewise reject the market data approach.

Both appraisers considered and plaintiff's appraiser used the income approach, defendant's appraiser rejecting the

same. The income approach begins with estimating the gross income of the subject property but neither appraiser, as indicated by the respective appraisals, did this by analyzing the "Participation Certificates, Series H" which financed the subject property. The amortization of the fund required to redeem the certificates is, in essence, the payment of rent. Accordingly, no evidence was presented by plaintiff comparing those actual rental payments with rentals from alleged comparable properties. This omission is critical because plaintiff's appraiser proceeds by estimating the economic or market rent for the subject property, i.e., the appraiser's estimate of the rent obtainable from similar properties, but none of the eight properties analyzed are similar to the subject property. Thus, plaintiff's appraiser states, in Plaintiff's Exhibit 1, at 17, with reference to the federal courthouse, that: "Under its present use the building is approximately 50% efficient." And, at 21, with reference to the federal office building: "[U]nder its present plan of utilization, it is approximately 60% efficient." Yet, at 37, in discussing adjustments to economic rental determined from comparable rental properties, he indicates that:

"Because of the fact that the subject property has large open lobbies, and superior architectural design, it is felt that it would command a base unit rent above the high end of the range discussed above, * * *. Additionally, the site is excessively large but adds to the architectural appeal of the structures. It is felt that additional rent of $1.00 per sq. ft. would have to be added to recapture this extra cost.

Also, it is felt that the base rate should be increased by floor within the federal office building at a rate of 30 cents per sq. ft. per floor. * * *"

■    As those familiar with appraisal know, relatively minor errors can produce significant inaccuracy in the final result. Accordingly, the court, being unpersuaded by the income approach concepts utilized by plaintiff's appraiser and the data based on those concepts developed by plaintiff's appraiser, finds that the appraisal, insofar as the income approach is concerned, has little probative value.

Both appraisers considered and defendant's appraisal witness used the cost approach, plaintiff's appraisal witness rejecting the same alleging that "the Cost Approach is not the best approach * * * [because] the subject property was

very expensive to reproduce, [i.e., an exact duplicate] because of the special design features." (Plaintiff's Exhibit 1, at 46.) The plaintiff's appraisal witness offered a replacement cost, as opposed to a reproduction cost, because "Replacement Cost would eliminate those overly expensive items which would not be recognized by a private developer." (Plaintiff's Exhibit 1, at 47.) Even though using replacement cost, which presumably eliminates all functional obsolescence, the plaintiff went forward to allege that the subject property suffers incurable functional obsolescence and contends that a loss in value to incurable functional obsolescence of $239,202 is indicated for the courthouse and a valuation loss of $1,921,041 for the office building. (Plaintiff's Exhibit 1, at 48.)

The defendant offered a cost approach based upon actual cost figures supplied by the plaintiff, trended for time and reduced for physical depreciation based upon an agreed 60-year life for the subject property. This approach is more persuasive than plaintiff's cost approach.

ORS 305.427 places the burden of proof upon the party seeking affirmative relief. The plaintiff has failed to sustain that burden. Therefore, the court finds that the true cash value of the subject property on January 1, 1980, was $7,961,040. Costs to neither party.