## IN THE OREGON TAX COURT

UNITED STATES OF AMERICA,
acting by and through the
GENERAL SERVICES ADMINISTRATION

*v.*

DEPARTMENT OF REVENUE

(TC 2220)

James L. Sutherland, Assistant United States Attorney, U.S. Department of Justice, District of Oregon, Eugene, represented plaintiff.

Marilyn Harbur, Assistant Attorney General, Department of Justice, Salem, represented defendant.

Decision for defendant rendered August 1, 1986.

**CARL N. BYERS, Judge.**

This case concerns the true cash value of a two-story federal courthouse and a four-story federal office building

located in downtown Eugene, Oregon.[1] The buildings were constructed in 1975 and occupy one full city block. The federal courthouse, consisting of two floors, contains approximately 17,500 square feet, while the federal office building has four floors and contains 90,105 square feet. The buildings are of reinforced concrete construction, with what may be regarded as high-quality characteristics. The assessed value for tax years 1981-82, 1982-83 and 1983-84 are in issue before the court.

In a prior case in this court for the 1980-81 tax year, this court determined that the property was special-use property. Accordingly, both appraisers in this case have utilized the cost approach as the most appropriate approach for this property. Both appraisers also determined that the property had an estimated life of 60 years and have applied physical depreciation on a straight-line basis.

The evidence adduced by the parties raised two main issues. The first issue is the reproduction cost of the subject property. Plaintiff's appraiser asked the architect who designed and supervised the construction of the buildings to estimate the cost of reproduction. The architect estimated the cost of the labor and materials, added additional amounts for such items as architect and engineering fees and construction supervision and came up with a reproduction new cost of $7,750,812 for 1981.

Defendant's appraiser relied on both replacement cost and reproduction cost. He estimated replacement cost by use of the Marshall Valuation Service Cost Factor Book. Since those factors do not include all "soft costs," defendant's appraiser added amounts for permanent loan fees, certain leasing costs, taxes and entrepreneurial profit. His determination of replacement cost for 1981 was $8,890,730.[2] In addition, the appraiser trended the historical actual construction cost for the inflation experienced from 1975 until the years in

---

[1] For background information concerning the taxable status of the property, see n 1 in *General Services Admin. v. Dept. of Rev.*, 9 OTR 325, 326 (1983).

[2] Although defendant's appraiser used a "replacement cost," he did not find any functional obsolescence. Consequently, his "replacement" would be essentially the same as the existing property.

question as an indication of reproduction cost. For comparison, this resulted in an indicated cost of $10,627,715 for January 1, 1981.

Both appraisals have their strengths and weaknesses. While plaintiff's estimate gains strength from the fact that the original architect worked up the costs, it appears less persuasive because it is so closely related to plaintiff's costs as opposed to market costs. The evidence indicated that plaintiff's actual costs were less than market costs because of its particular characteristics such as being self-insured and not required to obtain financing. It also lacks persuasiveness in view of the fact that it is substantially less than the trended historical costs found by defendant's appraiser. If defendant's historical costs as shown on page six of Exhibit A of $5,587,945 are accurate, plaintiff's reproduction cost new of $7,750,812 represents only a 38.8 percent increase from 1975 to 1981. This was a period of high inflation and defendant's trend factor of 72.9 percent is more reflective of that fact.

In addition to relying upon Marshall Valuation Service estimates, defendant considered the trended historical costs of the property. Even after including entrepreneurial profit and other "soft costs," defendant's estimate of replacement cost new, using Marshall Valuation Service, was still less than the trended historical costs. Thus the court finds defendant's estimate of replacement cost new more acceptable than plaintiff's even though defendant may have erred in including some soft costs in its estimates which should not have been included.

■ The fundamental difference between the estimates of both parties is that plaintiff limited its reproduction cost new to plaintiff's actual costs whereas defendant looked to market costs. On this basis, the court must choose defendant's estimate since the test is not what it would cost plaintiff to construct the property but what it would cost to construct the property in the open market. The fact that plaintiff is the federal government and for that reason avoids certain market expenses, such as construction insurance, is not relevant for purposes of establishing fair market value.

The other cause of dispute between the parties is plaintiff's deduction for functional obsolescence. Plaintiff's appraiser testified that by General Services Administration's

order dated June 20, 1979, plaintiff implemented a new policy to control building costs. That order establishes a policy restricting costs to a level which will "not exceed the building's capitalized income." The apparent purpose of the order is to bring building costs more in line with those incurred by the private sector under a "design to rent" concept. Plaintiff's appraiser considered the quality and type of construction of buildings both in the private sector and those constructed by plaintiff after issuance of the new policy. Based on this study, plaintiff's appraiser concluded that the trend in both the private sector and the government was to construct more functionally efficient buildings. By comparison to this new standard, plaintiff's appraiser found the subject property had within it substantial incurable functional obsolescence. As examples of functional obsolescence, plaintiff's appraiser cited the subject's single loaded corridors, L-shaped configuration, high grade doors and trim and the size of the lobbies. Overall, the appraiser concluded that the market would not justify the reproduction cost of the subject property and calculated the difference between subject's reproduction cost and the cost of a more functionally efficient replacement. To the difference between the two, he added capitalized operational costs attributable to the functional obsolescence for janitorial, utilities, taxes and insurance, arriving at a total functional obsolescence of $1,392,351.

■     In contrast, defendant's appraiser found no observable functional obsolescence. Recognizing that the property is a special-use property, this appraiser found that there had been no change in use. The appraiser had checked with the architect who reported that the building was satisfactory and they would make no changes in it if they had to do it over.[3] Defendant's appraiser therefore concluded that there was no functional obsolescence in the subject property but that plaintiff had merely instituted a new policy for buildings in the future.

■     Aside from some minor subarguments, the real source of plaintiff's functional obsolescence is the GSA policy order. It is doubtful that plaintiff's appraiser would have found any functional obsolescence except for this order. Finding by a

---

[3] This report apparently was made prior to the architect learning of the GSA order establishing the new policy.

preponderance of the evidence that this is so, the next question is whether plaintiff makes the market for courthouse and government office buildings. The evidence indicates not. Plaintiff submitted no comparable sales or any rental data from comparable properties and submitted no evidence that properties comparable to the subject are of less value. In the court's view, the change in the GSA policy is not a change in use but a change in the quality of the buildings to be provided to the public. While logic indicates that such a change in policy will affect the value of the subject property, that effect must be measurable. Plaintiff's appraiser assumed that buildings constructed under the new policy with the same square footage will have a comparable value to the subject property even though the subject would cost more to construct. If all of the difference were in functional features such as the L-shape of the building plaintiff might have a provable point. However, many of the changes which apparently would be wrought under the new GSA policy affect the aesthetics. There is no dispute that the subject property is a very attractive and publicly pleasing property. The sculptured courtyard, clear oak doors, spacious lobbies and perhaps even the single-loaded corridors and L-shape all contribute substantially to the attractiveness of the building. Logic indicates that if a purchaser had a choice between the subject property and an efficient rectangular building with small windows, narrow corridors, and of lesser quality construction, the purchaser would certainly attribute a value to the aesthetics and quality of construction. The court cannot assume that a trend towards lesser quality and more utilitarian buildings eliminates all value that might be associated with the quality and aesthetics of the subject. Based on the evidence adduced, plaintiff failed to adequately substantiate the existence and measurement of any functional obsolescence.

Accordingly, the court finds that the true cash value of the subject property as of the dates of appraisal are as follows:

| Assessment Date | Value |
| --- | --- |
| January 1, 1981 | $8,001,660 |
| January 1, 1982 | $8,428,980 |
| January 1, 1983 | $8,510,650 |

Defendant to recover its costs.